**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

_____
                                           )
JOSEPH TRAVERS,                )
                                           )
        Plaintiff,              )
                                           )
   v.                                 )   Civil Action No. 1:11-cv-10175-GAO
                                           )
FLIGHT SERVICES & SYSTEMS, INC., )
                                           )
        Defendant.          )
_____)

**PLAINTIFF'S STATEMENT OF GENUINE ISSUES OF MATERIAL FACTS IN RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Rule 56.1 Plaintiff Joseph Travers submits this statement of genuine issues of material fact in response to Defendant Flight Services & Systems, Inc. ("FSS") motion for summary judgment and states additional material facts as to which there exists a genuine issue to be tried, as follows:

**STATEMENT OF GENUINE ISSUES OF MATERIAL FACT**

*A. Travers' Protected Conduct*

1.     Joseph Travers was the first named plaintiff in a lawsuit against FSS and JetBlue filed on April 30, 2008. (See Pls.' Exhibit 1, Travers, et al. v. JetBlue Airways Corp. and Flight Services & Systems, Inc., D. Mass., 08-cv-10730, Complaint, Docket Entry # 1). That lawsuit, Travers, et al. v. JetBlue Airways Corp. and Flight Services & Systems, Inc., D. Mass., 08-cv-10730, challenged the $2 per-bag fee that JetBlue imposed for the curbside check-in services provided by skycaps. (Id. at ¶ 1).

2. In that lawsuit, Travers and the other plaintiffs alleged, *inter alia*, that the $2 per-bag fee was a tip or service charge that should have been paid to the skycaps and that JetBlue and FSS had violated the Massachusetts Tips Law, Mass. Gen. L. ch. 149, § 152A, by failing to remit the proceeds of that fee to the skycaps. (Id. at ¶ 2).

3. Travers and the other plaintiffs also alleged that the defendants had violated the Fair Labor Standards Act ("FLSA") and the Massachusetts Minimum Wage Law by paying the skycaps an hourly rate that was less than the applicable minimum wage but not permitting the skycaps to retain all of their tips, in violation of the FLSA, 29 U.S.C. § 203(m), and the Massachusetts Minimum Wage Law, Mass. Gen. L. c. 151 §§ 1 and 7. (See Pls.' Exhibit 2, Travers, et al. v. JetBlue, Amended Complaint, Docket Entry # 39 at ¶¶ 2, 3).

4. Travers was employed as a skycap at FSS from 2004 until September 27, 2010, servicing customers of JetBlue at Terminal C. (See Pls.' Exhibit 3, Declaration of Joseph Travers, "Travers Decl." ¶ 1).

5. In addition to being the first named plaintiff in the JetBlue litigation, Travers has been the most actively engaged plaintiff throughout the JetBlue lawsuit. (Id. at ¶¶ 2-8)

6. Travers actively participated in the discovery phase of the case. On January 20, 2010, he was the first plaintiff to be deposed by JetBlue and FSS. (See Pls.' Exhibit 4, Excerpts from the Deposition of Joseph Travers, "Travers Depo."). Moreover, he submitted two sworn affidavits prior to his termination: the first in support of the plaintiffs' motion for conditional class certification; and the second in support of the plaintiffs' motion for summary judgment against JetBlue. (See Pls.' Exhibit 5,

Plaintiffs' Motion to Allow Notice to Be Sent to Potential Plaintiffs, Docket Entry # 61-8; <u>See</u> <u>also</u> Pls.' Exhibit 6, Plaintiffs' Opposition to Defendant JetBlue's Motion for Summary Judgment, Docket Entry # 86-5).

7. In addition to his formal participation in the litigation, Travers played a central role in engaging other plaintiffs in the lawsuit, see below:

   a. Travers was one of the first plaintiffs to contact the plaintiffs' attorneys about filing a lawsuit. Thereafter he encouraged his co-workers to join the lawsuit. (<u>See</u> Pls.' Exhibit 3, Travers Decl. at ¶¶ 2-3).

   b. Other plaintiffs frequently sought out Travers when they had information relevant to the case or when they had a question related to the case. (<u>Id.</u> at ¶ 6).

   c. Travers was in close contact with the plaintiffs' attorneys and was the point person for the plaintiff group in communicating information to and from the plaintiffs' attorneys.  He would often contact the plaintiffs' attorneys for updates on the case that he would then convey to the other plaintiffs.  (<u>Id.</u> ¶ 5).

   d. Additionally, the plaintiffs' attorneys would often contact Travers and ask him to communicate information regarding the case to the other plaintiffs. (<u>Id.</u> ¶ 7).

   e. Travers organized meetings between the plaintiffs and their attorneys. (<u>Id.</u> ¶ 8).

   f. Moises Jackson stated in a declaration that he would not have joined the <u>JetBlue</u> lawsuit were it not for Travers' encouragement.  (<u>See</u> Affidavit of

3

Jeffery Rosin, "Rosin Aff." Docket Entry # 28-14, Tab 14, Declaration of Moises Jackson, "Jackson Dec." at ¶ 2). Jackson testified that he only joined the lawsuit because he was "repeatedly asked to do so by Joe." (<u>Id.</u>)[1]

g. Ezequias Paz "Paz" testified in a deposition that when he withdrew from the lawsuit Travers told him "you shouldn't leave. You should stay with us." (<u>See</u> Pls.' Exhibit 7, Excerpts from the Deposition of Ezequias Paz, "Paz Depo." at 38). Paz further stated in a declaration that Travers criticized him for withdrawing from the lawsuit. (<u>See</u> "Rosin Aff." Docket Entry # 28-15, Tab 15, Declaration of Ezequias Paz, "Paz Dec." at ¶ 3).

h. Lisa Varotsis "Varotsis", who was the General Manager of FSS at Logan Ariport at the time of Travers' termination, testified at her deposition that two skycaps, Moises Jackson and Ezequias Paz, felt "bullied" by Travers to stay in the lawsuit. (<u>See</u> Pls.' Exhibit 8, Excerpts from the Deposition of Lisa Varotsis, "Varotsis Depo." at 73-74).

### B. FSS's animus towards Travers based on his participation in the <u>JetBlue</u> lawsuit

8.     From approximately 2004 until April 2010, Robert Nichols was employed by FSS as the general manager for its operations at Logan Airport in Boston, Massachusetts. (<u>See</u> Pls.' Exhibit 9, Affidavit of Robert Nichols, "Nichols Aff." at ¶ 2). Nichols was responsible for supervising the FSS skycaps that performed curbside

---

[1] Plaintiff disputes that Travers engaged in any improper behavior in relation to the lawsuit as to Jackson, Paz or any other plaintiff in the original case. However, the statements of these witnesses is relevant evidence of plaintiffs' perception of Travers as centrally involved in the original case.

4

check-in for JetBlue, including Joseph Travers. (Id. at ¶ 3). Nichols was aware of the lawsuit brought by Travers and the other skycaps against FSS relating to JetBlue's $2 per-bag curbside check-in program. (Id. at ¶ 4). Nichols had regular telephone conferences with Robert Weitzel, Sr., the chairman and chief executive officer of FSS, and his son, Robert Weitzel, Jr., the president of FSS. (Id. at ¶ 5).

9.  During those telephone conferences, Robert Weitzel, Sr., would frequently tell Nichols that he "need[ed] to get rid of Joe" and that Nichols should "try to talk Joe into dropping the lawsuit." (Id. at ¶ 6). Weitzel Sr. would also complain about how much money he was spending on legal fees defending against the lawsuit and "yell" at Nichols about the lawsuit. (Id.).

10. Nichols frequently initiated conversations with Travers regarding the lawsuit. (See Pls.' Exhibit 3, Travers Decl. at ¶ 9). Nichols often told Travers that Weitzel was angry about the lawsuit and that Travers ought to withdraw. (Id.) Nichols also often told Travers that Weitzel inquired on a daily basis whether or not Travers had been "fired yet." (Id.) Nichols told Travers to "be careful" because the company would be "coming after [him]." (See Pls.' Exhibit 9, Nichols Aff. ¶ 7).

### C. FSS's Termination of Travers' Employment

11. On September 3, 2010 Travers was suspended indefinitely, allegedly pending an investigation into a complaint that Travers had "solicited a tip" from a passenger by informing the passenger about the $2 per-bag curbside check-in policy. (See Pls.' Exhibit 10, FSS Employee Contact Report dated Sept. 3, 2010).

12. The customer complaint that was the basis of the suspension read as follows:

> "The baggage man informed me that a tip is required just as you would tip in a restaurant. He said this is his lively hood. When I only tipped $1 he got angrier and said he was sorry I didn't like the service. He walked away, told someone he was going on break & slammed the door. I felt like he was hussling people." (See Pls.' Exhibit 11).

13.  Travers own statement regarding the incident read as follows:

> "I do Recall customer. When she Arrived At Podium, I Requested I.D. and How many Bags. Proceeded to Checkin Customer. Informed her of $2.00 fee. Adv customer fee was JetBlue and Tip was not included. Cust got upset and stated she didn't have to Tip. I Responded Tip was optional Just Like Restaurant and I Apologize if she Didn't Like The Service. I then went on Break." (See Pls.' Exhibit 10).

14.  The two managers present at the disciplinary meeting in which Travers was suspended were, John Cardinale ("Cardinale"), the manager responsible for overseeing skycaps at Terminal C and Nabil Agba ("Agba"), Travers's supervisor. (Id.; See Pls.' Exhibit 12, Excerpts from the Deposition of John Cardinale, "Cardinale Depo." at 6-8; See Pls.' Exhibit 13, Excerpts from the Deposition of Nabil Agba, "Agba Depo." at 8-9). Agba later confirmed that while Travers admitted to informing the customer of the $2 baggage fee and that a tip was optional, he did not feel that he had spoken rudely to the customer. (Id. at 24).

15.  The relevant rule in the FSS employee handbook regarding tip solicitation states as follows:

> "Solicitation of tips shall not be condoned. This includes any form of solicitation to include but not limited to – advising passengers of the amount of the tip that they must give to the employee for the service provided, refusing to provide service without first receiving a tip, selling weight, etc. Employees who are found to have solicited tips will be terminated immediately." (See Pls.' Exhibit 14, Excerpts from FSS Employee Handbook).

16.     At the curbside check-in stand where skycaps work, FSS has placed a sign that reads "Express Curbside check in, is $2 per bag. Tipping is optional but greatly appreciated." (See Pls.' Exhibit 13, Agba Depo. at 34-35).

17.     Sarah Collier ("Collier"), Director of Human Resources and Safety, testified that she was the person best suited to answer questions regarding FSS's procedures and practices with respect to investigating and evaluation passenger complaints. (See Pls.' Exhibit 15, Excerpts from the Deposition of Sarah Collier, "Collier Depo." at 19). With respect to the baggage fee, Collier testified that "skycaps typically inform the passenger if they have any questions that there is a 2-dollar fee." (Id. at 45). Collier also testified that Skycaps are allowed to say "that there is a 2 dollar fee and tips are not required but are appreciated." (Id.). Further, Collier testified that skycaps are "absolutely allowed" to use the word s "tip" and "gratuity" when talking to customers. (Id.).

18.     Agba testified that it was appropriate for a skycap to inform a customer that the "$2 fee, that's for each bag, and it goes to jet blue." (See Pls.' Exhibit 13, Agba Depo. at 33).

19.     Several skycaps testified that they regularly used language with customers similar to the language Travers is alleged to have used and which served as the basis for his termination:

   a. FSS skycap Rachid Faiz ("Faiz") testified that he routinely informs customers that "The $2 fee, 100 percent of it goes right to the airline" and that tipping is optional but greatly appreciated. (See Pls.' Exhibit 16, Excerpts from the Deposition of Rashid Faiz, "Faiz Depo." at 16-

7

17). Further, Faiz testified that he tells customers to read the sign regarding tipping that FSS has placed at the curbside check-in. (Id. at 17).

    b. FSS skycap Ezequias Paz ("Paz") testified that he regularly informs customers that "tipping is optional, but we really appreciate it." (See Pls.' Exhibit 7, Paz Depo. at 52). Paz explained that this language is not considered tip solicitation because he is merely informing the customer that tipping is an option. (Id. at 53). Paz expressed confidence that this language was acceptable and that he would not be discipline for using it. (Id. at 53-54).

20. FSS's "investigation" was inadequate and never uncovered any evidence to support the allegation of tip solicitation, see below:

    a. The "investigation" was carried out by Lisa Varotsis. (See Pls.' Exhibit 8, "Varotsis Depo." at 76). At the time Varotsis was the General Manager responsible for overseeing FSS employees at Logan Airport. (Id. at 7-8).

    b. Varotsis confined her investigation to reviewing Travers' written statement, speaking with the JetBlue employee who had fielded the customer's complaint, and conferring with Collier, her human resources director, about whether terminating a skycap for solicitation would be consistent with FSS policy. (Id. at 78-83).

    c. Vartosis never spoke directly to the customer that had made the complaint. (Id. at 117).

    d.    Varotsis testified that it was standard procedure at FSS to conduct a follow-up interview with the suspended employee. (Id. at 84-85). However, Varotsis further testified that she did not recall interviewing Travers to discuss the matter or ask about his version of events. (Id.)

    e.    Agba was the supervisor on the shift on which the alleged incident of solicitation occurred. (See Pls.' Exhibit 13, Agba Depo. at 17). Varotsis never spoke to Agba regarding what he had observed the day of the incident. (See Pls.' Exhibit 8, Varotsis Depo. at 106).

    f.    Varotsis interviewed Larry McLarty ("McLarty") and Jing Wei ("Wei"), who had been the only other skycaps working the day of the incident. (See Pls.' Exhibit 8, Varotsis Depo. 107-108; See Exhibit 13, Agba Depo. at 32). Both McLarty and Wei informed Varotsis that they had observed nothing unusual the day of the alleged solicitation. (See Pls.' Exhibit 8, Varotsis Depo., 107-108).

21.    The evidence in the record confirms Travers' account of the incident:

    a.    Agba testified in a deposition that he had not witnessed any incident between Travers and a customer on the day in question. (See Pls.' Exhibit 13, Agba Depo. at 14). Not only did Agba not witness anything unusual the day of the incident, no customer complained to Agba regarding Travers' conduct. (Id. at 22).

    b.    Following Travers' suspension, Agba asked McLarty and Wei if they had seen anything unusual the day of the incident. (Id. at 33).

        Although all skycaps work in close proximity throughout a shift, both McLarty and Wei gave statements that they had not observed anything unusual. (Id. at 32-33). Further both McLarty and Wei stated they had not seen Travers slam a door. (Id. at 33).

    c.  McLarty's written account of the day of the alleged tip solicitation states: "I, Larry McLarty, as of 9-3-10 Do Not Recall Hearing Any Passenger Complaining This Morning." (See Pls.' Exhibit 17, McLarty Statement).

    d.  Wei's written account of the day of the alleged tip solicitation states: "I work all morning. Everything is quiet & smooth. Everybody is happy!" (See Pls.' Exhibit 18, Wei Statement).

22.    Cardinale characterized Travers as a "good" employee who had never had any other "serious issues or violations or schedule problems." (See Pls.' Exhibit 12, Cardinale Depo. 13-14).

23.    Travers had only one minor disciplinary incident prior to his suspension. (See Rosin Aff., Docket Entry # 28, Tab 13, FSS Employee Contact Report dated March 2010). Varotsis testified that Travers's prior discipline had not factored into the decision to terminate Travers. (See Pls.' Exhibit 8, Varotsis Depo. at 96).

24.    On September 27, 2010 Travers was called into work to meet with Varotsis, Cardinale and with a state police officer. (See Pls.' Exhibit 19, FSS Employee Contact Report dated Sept. 27, 2010). At that meeting, Travers was terminated from his position as a skycap for purportedly soliciting a tip. (Id.)

25. Varotsis conferred with Collier regarding Travers's termination. (See Pls.' Exhibit 8, Varotsis Depo. at 79). Collier ultimately made the decision to terminate Travers. (Id. at 83-84). Collier is the "final word" on terminations. (See Pls.' Exhibit 15, Collier Depo. at 15-17).

26. Collier was aware that Travers was the first named plaintiff in the JetBlue lawsuit and was aware of the nature of lawsuit. (Id. at 30). Collier had frequent conversations with Weitzel Sr. regarding the cost of the lawsuit. (Id. at 36). Further, Weitzel Sr. had expressed frustration at the cost of the lawsuit to Collier. (Id. at 36).

### D. Travers communications with Varotsis during his suspension

27. In addition to working at FSS, Travers also worked for JetBlue directly as a customer service agent, a position which he has held since approximately December 2003. (See Pls.' Exhibit 3,Travers Aff. at ¶ 11).Travers' position at JetBlue is located within Terminal C, the same Terminal where the FSS skycap stand is located. (Id.)

28. Because of his position at JetBlue, Travers was regularly present in Terminal C throughout his suspension. (Id. at ¶ 12).

29. During Travers suspension he saw Varotsis as well as other FSS employees on several occasions. On at least two occasions Travers asked Varotsis about the status of her investigation. (Id. at ¶ 13). Travers never attempted to bully or intimidate Varotsis or anybody else at FSS. (Id.)

### E. Evidence of Disparate Treatment

30. At approximately the same time that Travers was terminated another skycap with whom Travers worked, Jing Wei was also suspended for purportedly

soliciting a tip. (See Rosin Aff., Docket Entry # 28-10, Tab 10(e), FSS Employee Contact Report dated Sept. 10, 2010).

31.     Jing Wei was also a named plaintiff in Travers v. JetBlue. (See Pls.' Exhibit 2, JetBlue Docket Entry # 39 at ¶ 8). Wei had joined the suit on March 9, 2009. (Id.). Wei withdrew from the lawsuit on August 12, 2011. (See Pls.' Exhibit 20, JetBlue Docket Entry # 155).

32.     As with Travers, a customer had submitted a written complaint that Wei had solicited a tip. (See Rosin Aff., Docket Entry # 28-10, Tab 10(e), FSS Employee Contact Report dated Sept. 10, 2010).The complaint, submitted by a JetBlue passenger's daughter, stated that after her 85 year old mother had paid the $2.00 bag charge Wei "asked her for a 'tip'" and "completely embarrassed" the customer who believed she had already proffered a tip. (Id.)

33.     The customer's complaint against Wei read as follows:

"My 85 year old mother was on flt 434 this morning, because she is 85 years old she checked her suitcase curbside, she was unaware of the $2.00 charge as she always tips the skycap $2.00 per bag, however the [sic] after she gave the gentleman her money he then asked her for a "tip" now my mother was completely embarrassed as she thought she already tipped the man and he then pointed out she had not. [H]ad she realized there was a charge for this service she most certainly would have tipped the man, but never should he have asked for a tip and embarrassed my mother in doing so, I hope you can re-train your people in the future." (Id.)

34.     Lisa Varotsis did not speak directly to the passenger or her daughter who had made the complaint and can neither confirm nor deny whether the daughter was present during the alleged solicitation. (See Pls.' Exhibit 8, Varotsis Depo. at 150-151).

35. In his statement regarding the interaction with the customer Wei admitted he might have mentioned that "the $2.00 is the Airline charge." (See Rosin Aff., Docket Entry # 28-10, Tab 10(e), FSS Employee Contact Report dated Sept. 10, 2010).

36. Not only did FSS decline to terminate Wei, he received no discipline at all. (See Rosin Aff., Docket Entry # 28-10, Tab 10(e), FSS Employee Contact Report dated Sept. 24, 2010).Notably, FSS treatment of Wei is inconsistent with Varotsis' testimony that the use of the word "tip" alone merited discipline. (See Pls.' Exhibit 8, Varotsis Depo. at 49).

37. Three of the four alleged comparators offered by FSS were terminated after engaging in misconduct far more extreme than the conduct which Travers is alleged to have participated in, see below:

> a. Kwado Acheampong was terminated on July 29, 2009, for threatening to abandon an elderly wheelchair bound passenger alone in the terminal if he did not receive a tip. (See Rosin Aff., Docket Entry # 28-10, Tab 10(a), FSS Employee Contact Report dated June 29, 2009). After Acheampong arrived with a wheelchair to collect an elderly passenger in the checking area he discovered she would be travelling alone. He asked the passengers family "Who is going to tip me?" and then stated "Do you want me to take her to the plane or leave her at the gate?" (Id.) The customer complaint against Acheampong was signed by three family members all attesting to the sequence of events and communications alleged. (Id.) The passenger never submitted a complaint on her own behalf. (Id.)

b.  Sami Gjinishi was terminated following an incident which occurred on July 9, 2009, in which he attempted to rob a wheelchair-bound passenger. (See Rosin Aff., Docket Entry # 28-10, Tab 10(b)). After transporting a wheelchair-bound passenger to the pick-up curb, Gjinishi repeatedly asked the customer "you got money?" When the passenger responded that she only had a 20 dollar bill, Gjinishi attempted to reach into her purse to take the passenger's money but was prevented by a "belt-clasp" located on the bottom of the purse. (Id.) After unsuccessfully attempting to take money forcefully from the passenger's purse, Gjinishi stood with his hand out asking for money. (Id.) The passenger eventually gave Gjinishi her 20 dollar bill which he put in his pocket without offering any change. (Id.) Only after the customer asked for change did Gjinishi reluctantly give her five dollars back. (Id.) The passenger described the skycap as "a threat" to elderly passengers and specifically requested that he be terminated. (Id.)

c.  Lumuri Noti was terminated after demanding a tip from a wheelchair-bound customer who she had wheeled to an ATM machine. (See Rosin Aff., Docket Entry # 28-10, Tab 10(d)). After demanding a tip, Noti then dropped the passenger's personal belongs, including a laptop and a camera and pushed the passenger into a cart, bruising the toes of her foot which was already in a cast. (Id.)

38. Jerry Quaranto, the fourth alleged comparator provided by FSS was terminated for tip solicitation on 11/15/2011, over a year after Travers was terminated. (See Rosin Aff., Docket Entry # 28-10, Tab 10(c), FSS Employee Contact Report dated Nov. 15, 2011).

39. The Reagan National Airport Skycap Emmanual Adom was terminated after specifically asking a customer for $20. (See Rosin Aff., Docket Entry # 28-10, Tab 10(f)).

40. There is evidence that skycaps who engaged in tip solicitation were not terminated and instead received much lighter forms of discipline or were transferred to other areas.

    a. Nichols testified in his deposition that during his tenure at FSS he only recalled one FSS employee who worked for JetBlue who had been disciplined for soliciting tips. (See Pls.' Exhibit 21, Excerpts from the Declaration of Robert Nichols, "Nichols Depo." at 148). Although he reported that that employee had been "bugging passengers for tips" and JetBlue had complained of her conduct, she was transferred to a position on a cleaning account for US Airways rather than terminated. (Id. at 150-151).

    b. Several months prior to his own termination, Travers testified that he recalled two employees who had been disciplined for soliciting tips. Travers testified that a customer had written a letter accusing an employee name "Zek" of soliciting a tip; Travers's understanding was that Zek may, at most, have received a write-up as a result of the

customer's letter. (See Pls.' Exhibit 4, Travers Depo. at 48). Another skycap named Tony, was terminated only after his wife had called a customer who had accused Tony of soliciting a tip. (Id. at 45-47).

## F.   *Evidence that FSS pressured Skycaps to withdraw from the lawsuit*

41.   Paz's testimony regarding his withdrawal from the lawsuit is inconsistent and overly vague. Although Paz's declaration stated that Travers "criticized" him for withdrawing from the lawsuit, in his deposition Paz repeatedly denied ever saying Travers had criticized him. (See Pls.' Exhibit 7, Paz Depo. at 35). In fact Paz testified that he "never said anything like that." (Id.) Additionally, when presented with his own declaration in a deposition Paz stated "I'm not sure if I said the whole thing that is written here." (Id.) Moreover, Paz claimed not to know who had written the document, who had presented it to him or where he had signed the document. (Id. 30-31). Further, Paz was also unaware that the document had actually been filed in court. (Id. 28-29).

42.   Abdelati Ennakori ("Ennakori") submitted a declaration stating he had not been pressured or intimidated into withdrawing from the lawsuit. (See Rosin Aff., Docket Entry # 28-18, Tab 18). However, in a subsequent deposition, Ennakori testified that the declaration had been written by an FSS lawyer in a FSS manager's office. (See Pls.' Exhibit 22, Excerpts from the Deposition of Abdelati Ennakori, "Ennakori Depo." at 18-19).

## **PLAINTIFF'S OPPOSITION TO DEFENDANT'S STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED[2]**

---

[2]   Plaintiff here addresses only Defendant's facts which he disputes for the purposes of summary judgment. With respect to Defendant's facts that Plaintiff does not dispute for purposes of summary judgment, Plaintiff reserves the right to dispute them later in this proceeding or at trial.

13.     Admitted, however there is no evidence in the record that Cardinale and Varotsis were the exclusive decisionmakers regarding Travers' suspension.

14.     Admitted, however Plaintiff disputes the legitimacy of that "investigation." See Pls.' SOF ¶ 20.

15.     Disputed.  Collier is ultimately responsible for all terminations throughout the company. See Pls.' SOF ¶ 25.

17.     Disputed.  Travers did not corroborate the account of the passenger. Travers never admitted to soliciting a tip. Furthermore, Travers denied speaking rudely to the customer. See Pls.' SOF ¶ 14.

18.     Disputed.  Travers did not engage in any conduct that could be construed as "bullying" or "badgering." Travers was employed by JetBlue in Terminal C throughout his suspension at FSS.   See Pls.' SOF ¶¶ 27, 28. Therefore Travers had a legitimate reason to be in Terminal C throughout his suspension from FSS.

Travers did see Vartosis a few times during his suspension when he was present in Terminal C because of his job at JetBlue. See Pls.' SOF ¶ 29. Travers did on at least two occasions ask Varotsis about the status of her investigation. Id. It was entirely normal and appropriate behavior for Travers to inquire into the status of his suspension when he saw Varotsis, who was tasked with carrying out that investigation. Travers never attempted to bully or intimidate Varotsis. See Pls.' SOF ¶ 29.

21.     Admitted as to Collier's testimony disputed as the existence of such a policy.  FSS produced no written policy stating allegations of tip solicitation supported by "first-person proof" always result in termination.  Furthermore, FSS

17

past practice regarding tip solicitation demonstrates that FSS had no such policy. See Pls.' SOF ¶ 30-40.

22. Disputed. This assertion is unsupported by the evidence in record. See Pls.' SOF ¶ 30-40.

24. Disputed. FSS has failed to provide a single example of an employee who was terminated, prior to Travers, solely on the basis of an allegation of tip solicitation. See Pls.' SOF ¶ 37-38.

25. Disputed. The evidence demonstrates that skycaps Acheampong, Gjinishi and Noti were fired for misconduct that went far beyond mere tip solicitation. See Pls.' SOF ¶ 37. Quantaro's termination is irrelevant because it occurred over a year after Travers was terminated. See Pls.' SOF ¶ 38. Furthermore, there is no evidence in the record to support FSS's contention that the customer who registered a complaint against Wei was not present during the alleged solicitation. See Pls.' SOF ¶ 34. Skycaps Adom's termination can be distinguished from Travers because he asked for a specific sum for a tip, conduct that is explicitly prohibited under FSS's tip solicitation policy. See Pls.' SOF ¶¶ 15, 39.

26. Disputed as to the relevance of Quantaro's termination. Quantaro's termination is irrelevant because it occurred over a year after Travers was terminated. See Pls.' SOF ¶ 38.

28. Disputed. See Pls.' SOF ¶ 30-36.

32. Disputed. FSS has failed to provide a single example of an employee at Logan Airport who was terminated solely on the basis of alleged tip solicitation

prior to Travers. See Pls.' SOF ¶ 37-39. Further, FSS has not substantiated its claim that the complaint against Wei was not "first hand." See Pls.' SOF ¶ 34.

33. Disputed. The skycaps testimony that they were not pressured to withdraw from the JetBlue lawsuit lacks credibility. See Pls.' SOF ¶ 41-42.

Respectfully submitted,

JOSEPH TRAVERS,

By their attorneys,

 /s/Hillary Schwab

Hillary Schwab, BBO #666029
Brant Cassavant, BBO #672614
LICHTEN & LISS-RIORDAN, P.C.
100 Cambridge Street, 20th Floor
Boston, MA 02114
617-994-5800

Dated: August 31, 2012

## CERTIFICATE OF SERVICE

I hereby certify that on August 31, 2012, a copy of this document was served by electronic filing on all counsel of record.

/s/Hillary Schwab
Hillary Schwab